UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

IMPRIMIS INTERNATIONAL, INC.,

      Plaintiff,

   v.                        NO. CIV. S-04-1297 FCD DAD

                                 FINDINGS OF FACT AND
                                 CONCLUSIONS OF LAW
ROBERT B. FRAIDENBURGH,

      Defendant.

_____/

----oo0oo----

On March 16, 2004, plaintiff Imprimis International, Inc. ("Imprimis") filed a Motion for Judgment in the Circuit Court for the City of Alexandria, Virginia, against defendant Robert B. Fraidenburgh ("Fraidenburgh") arising out of on an alleged breach of contract.  Subsequently, the case was removed to the Eastern District of Virginia on the basis of diversity jurisdiction and transferred to the Eastern District of California pursuant to 28 U.S.C. § 1404.  Plaintiff alleges (1) that it entered into an

1

agreement with defendant Fraidenburgh, doing business as Sunrise Precision; (2) that plaintiff performed all services, stipulations, conditions, and agreements as set forth in the contract; and (3) that defendant failed to pay the money owed plaintiff under the contract.  Defendant asserts that the contract was illegal and unenforceable.  Alternatively, defendant contends that plaintiff is entitled to receive only partial payment under the contract because the applicability of the doctrine of frustration of purpose and/or because of plaintiff's non-performance of contractual obligations.

The court held a bench trial on February 27-28, 2007, at which Ben Hord ("Hord"), the president of plaintiff Imprimis, and defendant Fraidenburgh were the sole witnesses.  Considering the evidence presented therein and the parties' written submissions thereafter, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

/////

/////

/////

---

[1]    The parties originally filed proposed Findings of Fact and Conclusions of Law on March 29, 2007 and April 2, 2007, bereft of any citation to the official trial transcript and any discussion of contract law.  After review of these filings, on April 3, 2007, the court directed the parties to file Supplemental proposed Findings of Fact and Conclusions of Law. (Minute Order, Docket # 78, filed April 30, 2007).  After the court granted defendant's request for an extension of time, the parties' amended briefs were filed on May 11 and May 14, 2007. Plaintiff's amended filing was not only untimely, but is substantially unchanged from the original filing.  However, for the purpose of completeness, the court will consider plaintiff's untimely filing.

**FINDINGS OF FACT**[2]

The parties entered into a contract for professional services, (TX 65),[3] which provides for a contingency fee arrangement, wherein plaintiff Imprimis would be paid out of funds received by defendant as the result of defendant receiving either a contract or a subcontract for the development and production of a device that would be used in a naval defense system. (Final Pretrial Conference Order, Docket # 69, filed Nov. 15, 2006, Undisputed Fact ¶¶ 1-2).[4]   The contract required

---

[2]    To the extent that any of the court's findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.

[3]    All citations to "TX ___" are to the Trial Transcript of the bench trial.  All citations *infra* to "TT ___" are to the exhibits admitted into evidence during the trial.  At trial, due to the apparent and utter disorganization of both parties' counsel, the exhibits were at times referred to by more than one number.  These exhibits were later submitted to the court without any further organization or proper labels.  All exhibits submitted to the court are joint exhibits by stipulation of the parties.  However, the majority, though not all, of the exhibits are marked with "plaintiffs exhibit" stickers.  The court will refer to the numbers on these stickers on the documents submitted to the court, unless otherwise noted.

[4]    Pursuant to Federal Rule of Civil Procedure Rule 16(e) and Local Rule 16-283, the Final Pretrial Order controls the subsequent course of the action.  One purpose of the Final Pretrial Conference Order is "to promote efficiency and conserve judicial resources by identifying litigable issues prior to trial."  Portsmouth Square, Inc. v. Shareholders Protective Comm., 770 F.2d 866, 869 (9th Cir. 1985).  While both parties proffered evidence at trial that seemingly sought to dispute the previously undisputed facts set forth in the Final Pretrial Conference Order, neither party moved to amend the order or demonstrated good cause for such amendment.  See Fed. R. Civ. Proc. 16.  As such, the undisputed facts, as set forth by the parties in their joint final pretrial report (Docket # 65) and incorporated in the court's Final Pretrial Conference Order (Docket # 69), are binding and controlling.  See United States v. First. Nat'l Bank of Circle, 652 F.2d 882, 886 (9th Cir. 1981) ("[A] party need offer no proof at trial as to matters agreed to in the order, nor may a party offer evidence or advance theorems at the trial which are not included in the order or which

plaintiff to perform certain management services on behalf of defendant, as well as assisting defendant to obtain funds already appropriated but not allocated to a Navy contracting office or government contract. (<u>Id.</u>, Undisputed Fact ¶ 3). The contract further provided that plaintiff would assist defendant over a period of four separate and distinct phases. (<u>Id.</u>, Undisputed Fact ¶ 4). Plaintiff provided services to defendant during the first phase by locating the appropriated funds and by assisting the Navy to transfer those funds. (<u>Id.</u>, Undisputed Fact ¶ 5). Plaintiff did not perform on phases 2-4 of the October 3, 2002 Agreement for reasons disputed between the parties. (<u>Id.</u>, Undisputed Fact ¶ 6).

Plaintiff Imprimis is a management consultation firm, focusing most of its business on issues related to federal appropriations and the Department of Defense. (TT 5:21-25). Principally, plaintiff is in the proposal preparation business, but it also provides general and financial management for its clients. (TT 5:17-20). Hord, the president of Imprimis, has over twenty years of experience in this business. (TT 5:13-14).

Defendant Fraidenburgh is a citizen and resident of the State of California, who at one time did business as Sunrise Precision. (Def.'s Am. Answer, Docket # 43, filed Feb. 3, 2006, ¶ 2). Defendant sought to become a second source for the Navy of circuits for traveling wave tubes ("TWTs"), a component necessary for the radar energy surrounding cruisers and warships. (TT 208:19-25; 209:11-24; 215:6-11). TWTs were manufactured by

contradict its terms.").

4

Teledyne, where defendant had previously been employed as a manufacturer of parts for TWTS. (TT 208:13-25). After defendant left Teledyne, he later approached the program manager at Teledyne, who welcomed the idea of having defendant as a second source of TWT parts. (TT 209:20-24). After suffering financial hardship from a failed personally financed first attempt to become a second source,[5] defendant traveled to Washington, D.C. to speak to a Congressman about the issue in order to obtain government funding. (TT 213:14-16; 214:19-215:2). Subsequently, Congress appropriated one million dollars for this project. (TT 8:1-6; 215:15-25). Defendant had never before dealt on his own with the governmental procedures of obtaining government contract funds. (TT 220:13-17). Therefore, he contacted Townsend Van Fleet, a registered lobbyist and a friend of defendant's friend, for help locating the appropriated funds in the budget. (TT 10:13-18; 218:2-22). Van Fleet advised defendant that he was going to need a proposal writer and referred defendant to plaintiff Imprimis and Hord. (TT 218:24-219:4).

Fraidenburgh first contacted Hord in or about May 2002. (TT 11:12-13). Defendant informed Hord about his experience in the field and his first failed attempt at becoming a secondary source. (TT 219:12-13). In or about June 2002, Hord met with defendant and engineers from Teledyne. (TT 11:12-12:12). Hord confirmed with Jim Trudel ("Trudel"), a manager at Teledyne, that Teledyne would support defendant's company as a second source if

---

[5]     Defendant testified that the first attempt to become a secondary source failed as a result of bad raw materials. (TT 212:9-213:13).

1   the appropriated funds could be found and directed toward this

2   project.  At that point, plaintiff and defendant entered into a

3   verbal agreement with the understanding that a written agreement

4   would be forthcoming with the effective date of June 5, 2002.

5   (TT 16:19-23).

6        Subsequently, Hord began trying to locate the funds that had

7   been appropriated for defendant's project.  (TT 12:24-13:12).

8   Hord was concerned that if the money was not found, it would go

9   into the Navy's general fund at the end of the fiscal year on

10  October 1, 2002.  (TT 9:8-14).  Hord knew that the money had been

11  appropriated because it had a line and a name in the government

12  appropriations and authorization bill, but he was having

13  difficult actually obtaining the money for the project.  (TT

14  13:14-22).  In or around August 2002, Hord located the office

15  where the money was.  (TT 13:20-25).  Subsequently, in or around

16  September 2002, Dick Flaherty ("Flaherty") and Hord from Imprimis

17  had a meeting at the Naval yard in Washington, D.C. with

18  representatives from the Naval base in Crane, Indiana and from

19  the program office in Washington, D.C.  (TT 14:2-20).  At this

20  five to six hour meeting, it was determined that the one million

21  dollars had mistakenly been put into another program, for which

22  it was not allocated, and that $80,000 of it had been used.  (TT

23  14:21-25).  Hord and Flaherty discussed how the money could be

24  appropriately redirected to defendant's second source project.

25  (TT 15:1-10).  It was determined that the Navy could get a

26  purchase order for $100,000 in order for defendant to begin the

27  project and then create a more in-depth engineering and services

28  contract with defendant for the remainder of the appropriated

funds.  (TT 15:11-21).  Thereafter, defendant's proposal to be a
second source for TWT materials was put on the agenda of a
regularly scheduled meeting between Teledyne and Crane Naval
Depot at Teledyne's offices in California in October 2002.  (TT
224:11-23).

Between August and October 2002, plaintiff and defendant
worked together to plan how defendant's project would be
implemented and what it would cost, in order to justify such
expenses to the government.  (TT 88:15-20; 89:3).  Defendant
submitted a list of what he believed was needed for the project
and the anticipated costs and Hord gave him notes and proposed
modifications.  (TT 89:9-14; TX 62-64).  Plaintiff and defendant
also prepared a document setting forth the proposed timeline for
the implementation of the project, from pre-award activities
through Phase II Engineering.  (TX 7, 69).  Hord referred to this
as the program object agreement and memorandum ("POA&M")
document.  (TT 99:6-9).

In mid-October 2002, prior to the meeting at Teledyne,
plaintiff and defendant executed a formal written contract for
plaintiff's services, which had been prepared by plaintiff.  (TT
158:19-24; 248:14-17).  The contract set forth generally that
Imprimis would provide services to Sunrise Precision, including
(1) locating and identifying "the monies earmarked to 'enable
Aegis System (TWT) to be made from competitive US molybdenum
suppliers'"; (2) preparing and submitting a proposal "to the
Government (through Teledyne Electronic Technologies, Rancho
Cordova, California) US Navy" in POA&M format; (3) providing
managerial support, financial management, and contractual

guidance; (4) assisting Sunrise Precision in obtaining follow-on

monies; and (5) supporting Sunrise Precision during the continued

multi-year effort.  (TX 65).  The contract outlined that the term

of payments to Imprimis "is based on the concept of performance

on the contract," which was divided into four phases with

specific duties enumerated under each.  (Id.)  Phase 1 is

described as "Planning and Preparation."  (Id.)  During this

phase, Imprimis was to (1) "assist Sunrise Precision in

establishing an entity to perform on the contract"; (2) "provide

the guidance and direction to Sunrise Precision"; (3) act as a

"management liaison" between the Navy and Sunrise Precision; (4)

"monitor the formation of an accounting system"; and (5)

"complete the program plan for Sunrise Precision."  (Id. at

Enclosure 1-1).  This phase was expected to be performed within 4

months with the rate of compensation for plaintiff set at $4000

per month.  (Id.)  Phase 2 is described as Engineering Design and

Initial Production, during which Imprimis agreed to provide

continuous guidance and direction to defendant's management team,

monitor financial management and contractual requirements,

provide the liaison and interface with the Navy and Teledyne, and

assist in obtaining the additional plus-up from Congress to

complete the required tasks.  (Id.)  Phase 3 was described as

Certification, and Phase 4 was described as Tungsten

Certification.  (Id. at Enclosure 1-2).  The contract also

memorialized that while the Agreement was formally executed by

plaintiff on October 13, 2002 and by defendant on October 17,

2002, the Agreement actually commenced on or about June 5, 2002,

the "Effective Date."  (TX 65).

8

At the meeting in late October 2002, defendant and representatives from Crane Naval Depot, Teledyne, and Imprimis discussed defendant's second source proposal. (TT 40:21-41:11; 225:7-14). Hord gave a Power Point presentation. (TT 41:17-25; 225:17-18). The presentation set forth in narrative form the program background, the program objectives, the proposed timeline for the implementation of the program, and the proposed approach. (TX 20).[6] The technical information included in the presentation was supplied by defendant, the Navy, and Trudel. (TT 134:8-13; 226:12-19). After Hord's Power Point presentation, a representative from Teledyne, Mike Baker, gave a presentation setting forth what Teledyne would require to be the prime contractor on the project. (TT 228:2-10). Thereafter, defendant gave a technical presentation for which he brought in a prototype of a TWT part that he had previously made. (228:13-23). The Navy agreed to the proposal, with Teledyne acting as the prime contractor and defendant acting as the subcontractor. (TT 228:9).

In January 2003, defendant received a purchase order from Teledyne in the amount of $100,000 to begin the project. (TX 61; TT 235:15-236:9). This was a result of a Statement of Work executed between defendant and Teledyne. (Id.) There is no

///

///

---

[6]   At trial, defendant expressed dissatisfaction with the Power Point presentation primarily because of the prevalence of Imprimis' logo throughout the presentation. (TT 227:3-16). Such belatedly expressed dissatisfaction is irrelevant to the inquiry before this court. There is no dispute that Hord gave the presentation at the October meeting.

evidence that Hord or plaintiff helped with the preparation of this document.[7]

After the October 2002 meeting, the relationship between plaintiff and defendant began to deteriorate.  Defendant had difficulty contacting Hord or plaintiff.  (TT 249:23-25). Defendant continued to e-mail plaintiff with information and status reports.  (TT 249:23-250:9).  Plaintiff's responses were sporadic and often unintelligible.  (TT 250:3-9; see e.g., TX 68, 77).  Hord admitted that there was a hiatus in communication between January and March 2003.  (TT 119:13-15).  In February 2003, defendant incorporated the entity that would perform on the subcontract, Optimet Corporation, with the help of his attorney, Frank Radoslovich.  (TT 242:18-243:9).  In March 2003, Hord told defendant that he was in Florida working for another client.  (TT 251:21-23).  When defendant expressed concern about the project, Hord stated that defendant did not need him to actually write a proposal because defendant's relationship with Teledyne was so good that it would carry the project through.  (TT 251:22-252:1). In fact, plaintiff did not write the Statement of Work for the remainder of the funds.  (TT 178:14-20; TX 46).  Rather, Teledyne drafted the Statement of Work with input from defendant.  (TT 178:20; 253:1-2).  Hord did not see this document, dated March 14, 2004, until his deposition was taken in the course of this

--------

[7]      Hord testified that the Statement of Work was virtually identical to the POA&M.  The court's review of these documents contradicts this testimony.  Not only do the "milestones" fail to coincide, but such objectives are phrased in very general terms on both documents.  (Compare TX 7 with TX 61).  As such, there is no evidence that the POA&M drafted by Hord and Imprimis had any effect on subsequent proposals.

litigation.  (TT 172:21-24; TX 46).  Hord contends that this document was crafted from information that he had previously drafted with defendant.  (TT 172:7-20).  However, none of the documents drafted by plaintiff, including the Power Point presentation or the POA&M document, nor the conclusory and self-serving testimony of Hord demonstrate that the Statement of Work was merely a rephrasing of plaintiff's information or prior work-product.  (Compare TX 46 with TX 20, 7, 69).

On April 22, 2003, defendant sent an e-mail to Hord, seeking to modify the terms of the contract because Teledyne had stepped into the role of proposal writer and project manager, which had been plaintiff's role under the contract.  (TX 50).  In May 2003, Hord and defendant met at defendant's attorney's office to discuss the contract.  (TT 258:7-24).  There was heated discussion regarding defendant's position that plaintiff had not performed fully under the contract and thus, was not owed the amount it sought.  (TT 259:4-12).  Finally, on or about August 24, 2003, defendant had a conference call at Teledyne with representatives from Teledyne and Crane Naval Depot during which the proposal was reviewed and the representatives from Crane Naval Depot told defendant that Hord should not receive any of the money allocated to the project.  (TT 262:11-25). Subsequently, on August 25, 2003, defendant sent an e-mail to Hord, informing him that defendant was instructed by the representatives from Crane that none of the funding could pay for plaintiff's services.  (TX 92).  The e-mail also gave Hord the name and telephone number of defendant's attorney and stated that ///

11

defendant would be relying on his attorney for advice in the

matter.  (TX 92).

Defendant has not paid plaintiff any fees under the

contract.  (TT 265:3-266:6).  Defendant has not reimbursed

plaintiff for any out of pocket expenses advanced or incurred by

plaintiff in connection with the contract.  (TT 265:3-266:6).

Plaintiff seeks damages in the amount of $117,000, the amount

that it believes will compensate it for the services actually

performed under the contract.  (TT 164:13-165:1).  Plaintiff also

seeks reimbursement for out of pocket expenses incurred in

performance of the contract.  (TX 2-4).

## CONCLUSIONS OF LAW

Plaintiff Imprimis has filed this action based upon its

contention that defendant Fraidenburgh breached their contract by

failing to pay for the professional services rendered by

plaintiff.  This court has jurisdiction based upon the parties'

diversity of citizenship.  Therefore, state law controls on all

substantive issues, including contractual interpretation issues.

Sherman v. Mutual Benefit Life Ins. Co., 633 F.2d 782, 784 (9th

Cir. 1980).  A district court sitting in diversity must apply the

choice of law rules of the forum state.  Ledesma v. Jack Stewart

Produce, Inc., 816 F.2d 482, 484 (9th Cir. 1987).  Although

explicitly directed by the court to do so, (Docket # 78), neither

party has set forth what state law they believe should apply to

///

///

///

///

12

this case nor have they consistently applied any one state's law in their discussion of contract principles.[8]

The contract between the parties provides that the contract "shall be governed by the State of Virginia." (TX 65).   Under California law, absent the presence of strong public policy requiring application of California law, the intention of the parties to apply Virginia should govern.   <u>Consolidated Data Terminals v. Applied Digital Data</u>, 708 F.2d 385, 391 (9th Cir. 1983); <u>see</u> <u>Haisten v. Grass Valley Med. Reimbursement Fund</u>, 784 F.2d 1392, 1402 (9th Cir. 1986).   Because the court is not aware of any such strong public policy and because the parties have not raised any argument whatsoever relating to choice of law, the court will apply Virginia state contract law to the facts of this case.[9]

### 1.   Illegal and Unenforceable Contract

Defendant contends that the contract is illegal and unenforceable because it required him to pay Hord federal funds for influencing the Navy in connection with the award of a federal contract, in violation of 31 U.S.C. § 1352.   "Generally, a contract based on an act forbidden by a statute is void and no action will lie to enforce the contract." <u>Eure v. Jefferson Nat'l Bank</u>, 248 Va. 245, 252 (1994) (quoting <u>Blick v. Marks, Stokes and Harrison</u>, 234 Va. 60, 64 (1987)).   However, "the

---

[8]   Despite the court's explicit instruction to do so, (Docket #78), plaintiff has failed to submit any argument regarding contract law in its supplemental briefing.

[9]   Defendant's prior counsel, who filed the motion to change venue pursuant to 28 U.S.C. § 1404 from the Eastern District of Virginia to this court, conceded in his moving papers that Virginia law applies to this action.

illegal . . . nature of a contract for professional services will not be presumed; the burden of proving the illegality of the contract is clearly upon the party asserting it." Troutman v. S. Ry. Co., 441 F.2d 586, 589 (5th Cir. 1971) (holding that the defendant failed to demonstrate that the employment contract at issue was illegal as a contract to improperly influence a public official in the exercise of his duties where the plaintiff's influence was used merely to obtain an audience with the President to present the merits of the defendant's position) (citations omitted)[10]; see Steele v. Drummond, 275 U.S. 199, 205 (1927) ("Detriment to the public interest will not be presumed, where nothing sinister or improper is done or contemplated."). Section 1352 provides, in relevant part:

> None of the funds appropriated by any Act may be expended by the recipient of a Federal contract . . . to pay any person for influencing or attempting to influence an officer or employee of any agency . . . .

31 U.S.C. § 1352 (West 2007).  The provisions of § 1352 also apply to any person who receives a subcontract under a Federal contract.  31 U.S.C. § 1352(b)(5).  However, this limitation on use of federal funds does not apply "if the payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal contract . . . ."  31 U.S.C. § 1352(d)(1)(B).

---

[10]     Because the case law interpreting § 1352 is sparse and inapplicable to the facts of this case, the court finds persuasive decisions relating to the enforceability of contracts for personal services that have been challenged as illegal or against public policy because they contemplate the use of personal or political influence upon the government.

By its terms, the contract does not implicate the provisions of § 1352.  (TX 65).  The contract contains no terms which call for plaintiff to influence Congress or agency officials in obtaining a federal contract.  However, defendant argues that in executing the contract, particularly in "locating and identifying the monies," Hord, on behalf of plaintiff Imprimis, influenced "Navy brass" into diverting the already appropriated funds into defendant's project.  In support of this contention, defendant relies on admissions to him by Hord that he was going to contact his "buddies" in Washington to make sure the money didn't go away.  (TT 238:13-17).  Defendant also contends that Hord stated to him on several occasions that "[he] made the money come, [he] could make it go away."  (TT 253:23-25).

The court finds credible defendant's testimony that Hord made statements alluding to some inordinate amount of influence he had over the allocation of federal funds.  While such statements are admissible, substantive evidence as admissions by a party opponent, the court, as the trier of fact, must determine the weight to give to such statements, considering the circumstances under which they were made.  The testimony of both defendant and Hord reveal that defendant had no experience with the governmental procedures of obtaining government contract funds and that Hord had over twenty years of experience in this area.  (TT 5:13-14; 220:13-17).  The evidence also demonstrated that throughout the performance of the contract, Hord sought to impress the weight of such expertise on defendant and make his services appear both essential and invaluable to defendant's success in executing the project.  This remained true even after

15

it became clear that Teledyne had stepped into the role of project manager and proposal writer. (See TX 49).  Defendant testified that Hord's admissions regarding making contact with his "buddies" about the funding was made after the October 2002 meeting at Teledyne, when it was apparent that Teledyne would be the prime contractor for the second source project. (TX 238:1-24).[11]  Defendant further testified that Hord made statements regarding making the money go away at several points after the October 2002 meetings, including in May 2003 when defendant expressed that he did not want to pay the money plaintiff believed was due under the contract. (254:3-5; 259:13-15).  The court finds that these circumstances indicate that plaintiff's statements were made in an attempt to bolster his position in defendant's eyes and maintain the contractual relationship, which was on tenuous ground.  As such, Hord's statements alluding to his conduct and ability to influence Naval officials are insufficient to demonstrate that plaintiff's conduct in performing under the contract violated § 1352 and rendered the contract unenforceable.

Further, the court also finds credible Hord's testimony that he arranged a meeting with Naval officials in September 2002

---

[11]  Moreover, Hord's statement that he would talk to his "buddies" or "friends" regarding the funding does not necessarily implicate "influence" within the meaning of § 1352.  Any influence based upon Hord's personal relationship with Naval officials may have been employed solely to gain access to the appropriate individuals in order to present the merits of his client's case.  See Troutman, 441 F.2d at 589 (citing Hall v. Anderson, 18 Wash. 2d 625 (1943); Old Dominion Transp. Co. v. Hamilton, 146 Va. 594 (1926)); see also Coyne, 80 F.2d at 847 ("There must be proof that something contrary to good morals was contemplated or done.").

during which he confirmed and informed the officials that the appropriated funds had been misdirected to a project that could not use the funds and that defendant's project could properly utilize the appropriated funds.  Hord's conduct in locating the appropriated funds and informing the Navy that they were currently allocated to an improper project is properly interpreted as a professional service rendered in preparation and negotiation of defendant's application for the federal subcontract.  See Trist v. Child, 88 U.S. 441 (1874) (drawing the distinction between the use of personal influence to secure legislation and legitimate professional services in making the legislature acquainted with the merits of the measures desired).  Such testimony also demonstrates that Hord presented the merits of defendant's proposal to the Naval officials.  See Puma Indus. Consulting, Inc. v. Daal Assocs., Inc., 808 F.2d 982, 984-85 (2d Cir. 1985) (holding that contingent fee arrangement between the defendant and the plaintiff, who assisted small businesses in procuring contracts with the government, did not violate 41 U.S.C. § 254(a) or public policy because there was no hint that the plaintiff was selling government interest, the harm that is to be protected against); Coyne v. Superior Incinerator Co. of Texas, 80 F.2d 844, 846-47 (2d Cir. 1936) (holding that the contingent agreement with the plaintiff, who had a friendship with a government official, was not illegal or unenforceable where there was no evidence that the plaintiff did anything more than use his connection to obtain and a hearing and then try to sell the product on the merits); cf. Ewing v. Nat'l Airport Corp., 115 F.2d 859, 860-61 (4th Cir. 1940) (declaring the

17

contingency fee contract for professional services unenforceable where the evidence of improper influence including letters in which the plaintiff admitted that he promised senators to exert political influence in their home states in return for their help in passage of the legislation).  As such, plaintiff's conduct is explicitly addressed by the exception for professional and technical services set forth in § 1352.  Therefore, the contract, as performed by plaintiff, is not illegal or unenforceable.

### 2. Frustration of Purpose

Defendant also contends that the court should not enforce the contract based upon the defense of frustration of purpose.[12] The doctrine of frustration of purpose discharges a party from its contractual obligations due to some supervening occurrence which frustrates the party's purpose in entering into the contract.  <u>Coker Int'l, Inc. v. Burlington Indus., Inc.</u>, 935 F.2d 267 (4th Cir. 1991).

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1979).  Defendant asserts that when Teledyne became the prime contractor for the second source project and defendant became the subcontractor, Phases 2-4 of the contract were commercially frustrated because Teledyne was in charge of all dealings with the Navy.

---

[12] While this affirmative defense was not pled in defendant's answer, for the sake of completeness, the court will consider the applicability of this theory to the facts presented at trial.

1  Specifically, defendant asserts that plaintiff did not assist in
2  drafting the proposal submitted to the Navy because Teledyne
3  drafted the proposal.

4      Determination of the purpose of the contract is a matter of
5  contract interpretation.  Virginia law respecting contract
6  interpretation is well settled.  Bridgeston/Firestone, Inc. v.
7  Prince William Square Assocs., 250 Va. 402, 407 (1995).  "When
8  contract terms are clear and unambiguous, a court must construe
9  them according to their plain meaning.  Id. (citing Food First,
10 Inc. v. Gables Assocs., 244 Va. 180, 182 (1992); Winn v. Aleda
11 Const. Co., 227 Va. 304, 307 (1984)).  "[A] court must construe
12 the words as written and not make a new contract for the
13 parties."  Id. (citing Berry v. Klinger, 225 Va. 201, 208
14 (1983)).  Parol evidence may only be admitted to establish the
15 intention of the parties, and thus, the real contract between the
16 parties when the language of a contract is ambiguous.  Tuomala v.
17 Regent Univ., 252 Va. 368, 374 (1996).

18     The contract between plaintiff and defendant provides that
19 plaintiff "Imprimis will provide Business Development and
20 Corporate Support to Sunrise Precision."  (TX 65).  In addressing
21 plaintiff's duties in drafting proposals for the Navy, the
22 contract explicitly provides that plaintiff will "[p]repare and
23 submit a proposal to the Government (through Teledyne Electronic
24 Technologies, Rancho Cordova, California) . . . containing the
25 appropriate plan in POA&M format."  (TX 65) (emphasis added).
26 The contract also provided that plaintiff will provide support
27 and guidance "in support of the performance on the ensuing
28 contract/task orders/purchase orders from the Navy through

19

*Teledyne Electronic Technologies*.  (TX 65) (emphasis added).
Moreover, under the "Terms and Conditions" of the contract, which
breakdown plaintiff's explicit duties into the four phases, the
contract language consistently refers to Teledyne's role in the
project and explicitly sets forth that the "Navy has agreed to
provide the remaining monies of the $1M plus up to Sunrise
Precision *through Teledyne Electronics Technologies*." (TX 65 at
Enclosure 1-1).  The court finds that it is clear from the
unambiguous terms of the contract that the parties contemplated
that Teledyne would be the prime contractor and that defendant
would be the subcontractor on the second source contract.
Because defendant's asserted "supervening occurrence" was
contemplated in the contract, the purpose of the contract was not
frustrated by an event, "the non-occurrence of which was a basic
assumption on which the contract was made."  See Restatement
(Second) of Contracts § 265.  Therefore, the defense of
frustration of purpose does not apply to this case.

### 3.   Failure of Consideration/Performance

Defendant also asserts that the contract should not be
enforced because of failure of consideration.  (See Def.'s Am.
Answer, Docket # 43, filed Feb. 3, 2006, at 2; Final Pretrial
Conference Order, Docket # 69, Disputed Facts ¶ 8).
Specifically, defendant contends that any failure by defendant to
pay plaintiff's fees under the contract described resulted from
plaintiff's failure to perform the services required under the
contract.

What is sometimes referred to as a "failure of
consideration" by courts and statutes, is referred to by the

Restatement (Second) of Contracts as "failure of performance. Restatement (Second) of Contracts § 237 comment a (2007); see Citland, Ltd. v. Com. ex re. Kilgore, 45 Va. App. 268, 277 n.5 (2005) (citing § 237 of the Restatement (Second) of Contracts); see also R.G. Pope Const. Co., Inc. v. Guard Rail of Roanoke, Inc., 219 Va. 111, 119 (1978) (finding that in a contract for reciprocal promises, the performance of the defendant's duty did not become due until the plaintiff's performance occurred or was excused). "A material failure of performance, including defective performance as well as an absence of performance, operates as the non-occurrence of a condition." Id. Such non-occurrence of a condition prevents the performance of the duty subject to that condition from becoming due or, if performance is no longer possible, discharges the duty. Id.; Horton v. Horton, 254 Va. 111, 116 (1997) ("If the initial breach is material, the other party to the contract is excused from performing his contractual obligations."). The failure to perform is deemed "material" where the "breach was so central to the parties' agreement that it defeated an essential purpose of the contract." Horton, 254 Va. at 116 (citations omitted); see RW Power Partners, L.P. v. Virginia Elec. and Power Co., 899 F. Supp. 1490 (E.D. Va. 1995) (stating that "a material breach is one that goes to the root of the contract").

The evidence at trial demonstrated that plaintiff performed services for defendant beginning in June 2002, the effective date of the contract. Between June 2002 and October 2002, plaintiff met with defendant in California, attended meetings in Washington, D.C., to ensure that the appropriated funds were

available for defendant's project, discussed with defendant the anticipated costs of implementing the project, drafted the POA&M document, and gave a Power Point presentation at the Teledyne facility in October 2002.  As such, the court finds that plaintiff performed the services required under the contract up until November 2002.

However, the evidence also demonstrated that subsequent to the meeting at Teledyne in late October 2002, plaintiff's relationship with defendant quickly deteriorated.  The parties had little communication with each other.  The sparse communication that did take place consisted primarily of defendant's attempts to contact Hord and keep him apprised of the status of the project.  Defendant incorporated the corporation that was to perform under the project, Optimet, with the help of his attorney, not Hord.  Hord did not contribute to the drafting of the proposal that was submitted to the Navy in March 2003, and in fact, had never seen the document until the commencement of this litigation.  Nor is there any evidence that plaintiff took an active role in helping defendant set up or manage his corporation in 2003.  Such failure of communication and lack of active participation in defendant's business and the negotiations between defendant, Teledyne, and the Navy go to the root of plaintiff's contract "to provide Business Development and Corporate Support to Sunrise Precision."  As such, plaintiff failed to perform a material condition of the contract.  Further, such performance could no longer occur because the professional services contracted for, at least under Phase 1, were plaintiff's assistance and support in obtaining the government contract.

Therefore, defendant was relieved of his subsequent duty to pay plaintiff or further perform under the contract.[13]  See Horton, 254 Va. at 116-17.

**D.  Damages**

Under Virginia law, a party who commits the first material breach of a contract is not entitled to enforce the contract. Federal Ins. Co. v. Starr Elec. Co., 242 Va. 459, 468 (1991); see Horton, 254 Va. at 117 ("[A] party who has materially breached a contract is not entitled to recover damages for the other party's subsequent nonperformance of the contract.").  Further, if the contract is entire, a party's material breach will preclude recovery, even for partial performance prior to the breach.  Am. Chlorophyll v. Schertz, 176 Va. 362, 371 (1940).  If the contract is divisible, a party may recover for part performance and such recovery is not barred by a subsequent breach by the party who seeks recovery.  Id.  The entirety or divisibility of a contract is dependant on the intention of the contracting parties.  Id. (citing Eschner v. Eschner, 146 Va. 417 (1926)).

The terms of the contract demonstrate the parties' intent that the contract be divisible.  The contract was set up to be performed in four separate phases, generally coinciding with the anticipated implementation of defendant's project.  Within each phase, the payment for plaintiff's services was set out in

---

[13]  Both parties stated in the Final Pretrial Conference Order that plaintiff did not perform under Phases 2-4 of the contract.  Further, based upon the evidence presented at trial, the court finds that plaintiff did not perform any services under Phase 2 of the contract, which was directed at Engineering Design and Initial Production Stage of the project.  (TX 65).  As such, plaintiff's contention that it performed under Phase 2 of the contract is both contradictory and utterly without merit.

monthly intervals.  The payment structure was not based upon

benchmarks achieved by plaintiff or defendant, but rather by

supporting services provided during the month.  Therefore, the

court finds that the contract is divisible, and thus, plaintiff

may recover for partial performance despite its subsequent

failure to perform.  See id. at 372 (finding that the contract

was divisible where the defendants promised to pay the plaintiff

in regular intervals and where the contract was to be performed

in separate stages).

In a divisible contract, "the party in breach is entitled to

restitution for any benefit that he has conferred by way of part

performance."  Restatement (Second) of Contracts § 374 (2007);

see Am. Chlorophyll, 176 Va. at 373.[14]  The sum of money to be

awarded to protect a party's restitution interest is the

reasonable value to the other party of the services he received.

Restatement (Second) of Contracts § 371 (2007).

Defendant does not dispute that the reasonable value of

plaintiff's services for planning and preparation under Phase 1

of the contract is $4000 per month.  (See Def.'s Am. Proposed

Findings of Fact and Conclusions of Law, Docket # 82, filed May

11, 2007, at 43 ¶ 5).  The evidence at trial demonstrated that

plaintiff performed under Phase 1 of the contract from June 2002

---

[14]   Defendant notes that plaintiff did not plead damages
under a theory of restitution or quantum meruit.  However,
defendant is mistaken.  Plaintiff sought damages for $117,000,
the asserted value of the services that it believed it performed
under the contract.  Plaintiff did not seek damages under the
penalty clause of the contract or for the full value of the
contract.  Therefore, implicitly plaintiff seeks an award of
damages measured by the reasonable value of the services
rendered, i.e. restitution.

through October 2002, a period of five months.[15]   Therefore, the value of plaintiff's services prior to its failure of performance is $20,000.[16]   Plaintiff also demonstrated at trial that prior to its failure of performance, it incurred $604 in travel and expenses in June 2002.  (TX 2).   The remaining expenses presented at trial were incurred after October 2002, and thus, are not recoverable.[17]   As such, plaintiff is entitled to restitution damages in the amount of $20,604.00.

The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: May 31, 2007.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[15]   The contract anticipated that Phase 1 would take approximately four months to complete.   The evidence at trial demonstrated that Phase 1, as contemplated under the contract, took over a year to complete.

[16]   In its calculation of damages, plaintiff implicitly argues that after providing four months of services at $4000, the cost of its services rose to $9000 per month.   However, under the contract, plaintiff was to be paid $9000 per month for services provided during the engineering design and initial production stage of the project, Phase 2.   These services were never provided because the project never reached this stage before plaintiff's failure of performance.   Therefore, the court does not find that any of plaintiff's performed services can be valued at $9000 per month.

[17]   Plaintiff also incurred travel expenses in February and May 2003.   However, plaintiff cannot be compensated for these costs because they were incurred after plaintiff's material failure of performance.